Raymond RUSSELL, Plaintiff

v.

BOARD OF TRUSTEES OF UNIVERSITY OF ARKANSAS, Specifically, Raymond P. Miller, M.D., Chairman, Lewis L. Ramsey, Jr., Bradley D. Jesson, Kaneaster Hodges, Diane Nolan, Jacqueline Douglas, Ph.D., Robert Pugh, Hugh B. Chalmers, Jack Williams, Hall McAdams, III, and Herman Smith, Chancellor, University of Arkansas at Pine Bluff, Defendants.

No. PB–C–80–253.

United States District Court,
E. D. Arkansas,
Pine Bluff Division.

Sept. 10, 1980.

Silas H. Brewer, Jr., Michael Hamilton, Kaplan, Brewer & Bilheimer, Little Rock, Ark., for plaintiff.

Ray Trammell, Gen. Counsel, University of Ark., Fayetteville, Ark., Nelwyn Davis, Asst. Atty. Gen., State of Ark., Little Rock, Ark., for defendants.

MEMORANDUM AND ORDER

EISELE, Chief Judge.

In this case the plaintiff seeks a preliminary injunction and a permanent injunction requiring the defendants to permit the plaintiff and others similarly situated to retain their instructional employment status with the University of Arkansas at Pine bluff until they reach age 72. Initially, the Court notes that the plaintiff has made no attempt to satisfy the requirements of Fed. R.Civ.P. 23, which are prerequisites to maintenance of a class action. The case is, therefore, proceeding as only an individual action.

On August 18, 1980, a hearing was held by agreement of the parties on the motion for a preliminary injunction and on the merits of the case. At the conclusion of the hearing, the Court made tentative findings of fact, which are hereby adopted as final. A supplement to those findings is set forth below. If there is any conflict, the latter shall control.

Arkansas Agricultural, Mechanical and Normal College (AM & N) was a previously existing state–supported school which traditionally had, for practical purposes, an all black staff and student body. Act 512 of 1971, enacted by the Arkansas General Assembly and effective as of April 2, 1971, provided for the merger of AM & N into the University of Arkansas system, as a part thereof to be known as the University of Arkansas at Pine Bluff (UAPB). Act 512, 1971 Ark.Acts 1138 (1971) (hereinafter "Act 512"). The relevant portions of Act 512 are quoted in full, as follows:

SECTION 4. The Presidents of Arkansas Agricultural, Mechanical and Normal College and the University of Arkansas, other officials, faculty and staff members of each institution shall develop plans to provide for an orderly transition of Arkansas Agricultural, Mechanical and Normal College into the University of Arkansas. The Presidents of each institution shall be responsible for designating officials or others of their respective institutions to develop such plans and the Presidents shall be responsible for the coordination of the planning by the two institutions to provide for a smooth and orderly transition. All final plans and agreements shall be in written form. The final plan of merger shall provide for the accomdation [sic] by the University of Arkansas of the employment contracts, tenure rights, and academic rank of the faculty and staff of Arkansas Agricultural, Mechanical and Normal College in effect during the 1970–71 academic year.

The President of the Arkansas Agricultural, Mechanical and Normal College shall become the Chancellor of the University of Arkansas at Pine Bluff.

SECTION 5. The Board of Trustees of the University of Arkansas shall, on July 1, 1972, become vested with, and succeed to, all the rights, titles, powers, interests, properties, assets, funds, and credits of the former Arkansas Agricultural, Mechanical and Normal College and/or the Board of Trustees of said College, including all rights, titles and interests in and to all real and personal property heretofore acquired by or vested by law in or for the use of the said College and/or in or for the use of the Board of Trustees of that institution; and, the Board of Trustees of the University of Arkansas shall, on that date, assume the future duties and future responsibilities of a program of higher education on the Pine Bluff, Arkansas, Campus which was formerly occupied by Arkansas Agricultural, Mechanical and Normal College dating only from and after July 1, 1972.

The plaintiff was a tenured professor at AM & N prior to the merger. AM & N had a policy of allowing professors to teach until they reached the age of 72. The University of Arkansas system has a mandatory retirement age of 67.

After passage of Act 512 and pursuant to Section 4 of the act, a committee was constituted to develop plans to provide for an orderly transition of AM & N into the University of Arkansas. The committee prepared a written plan, which it submitted to President Charles E. Bishop of the University of Arkansas. The plan provided in part:

B. University policy concerning automatic retirement at the age of sixty–seven, as stated on page 15 of the 1971 revised *Faculty Handbook*, not become effective for U.A.P.B. personnel until July 1, 1980. *In practice this will allow the staff of U.A.P.B. who reach the age of sixty–seven before July 1, 1980, to be employed until they are seventy–two years of age.* Employees who reach the age of sixty–seven after July 1, 1980, must come under the University retirement policy.

(Emphasis added).

On June 12, 1975, President Bishop presented the plan to the legal committee of the Board of Trustees of the University of Arkansas. Subsequently, President Bishop, or someone working in his behalf, revised the quoted portion of the plan, pursuant to the instructions of the legal committee, to read as follows:

University policy concerning automatic retirement at the age of sixty–seven shall become effective for UAPB personnel July 1, 1980. *In practice this will allow the staff of UAPB who reach the age of sixty–seven before July 1, 1980, to be eligible for employment until 1980 or until they reach seventy–two years of age, whichever comes first,* except, that, at the option of the University, the individual may be employed on a part–time basis, and in a non–administrative position, until the end of the fiscal year in which he reaches age 70.

(Emphasis added). The plan, as revised, was finally approved by the Board of Trustees on June 27, 1975.

The committee which originally developed the plan had no notice of the change concerning retirement policy from the time the plan was submitted on June 12, 1975, until the time the Board of Trustees finally approved the plan on June 27, 1975. The committee members were not consulted about the change during that period.

The Court finds specifically that after the revised plan was finally approved, the Board of Trustees gave both direct and indirect notice of the contents and approval of the plan to Chancellor Herman Smith of UAPB. In this regard, the Court finds that the Board of Trustees did what was reasonably expected and anticipated as necessary to give notice to those affected by the plan, as revised. Chancellor Smith did not, however, communicate actual notice of the revision and approval of the plan to all of those affected. The Court finds that the plaintiff had no actual notice of the pertinent revision until late in 1979.

The University administration did attempt to give notice directly to the plaintiff (and others similarly situated) of the possibility that they would be forced to retire at age 67. The UAPB Faculty/Staff Handbook for 1976–77 states at page 41A:

Supplement A to Retirement Statement

The employee is hereby put on notice that the University of Arkansas system requires mandatory retirement at age 67. However, employees at the University of Arkansas at Pine Bluff will be allowed to continue employment to age 72 pending action dictated to the contrary by the University Board of Trustees and/or a court of valid and final jurisdiction, which presently controls this matter.

Although this language is admittedly not precise, it did constructively put the faculty at UAPB on notice that they might be required to retire at age 67.

The reference to "a court of valid and final jurisdiction which presently controls this matter" is to the United States District Court for this District, before which was pending the case of *Molette v. Bumpers*, No. LR–72–C–116 (E.D.Ark. filed May 22, 1972). That case was a challenge to the constitutionality of Act 512. Before the constitutionality of the merger was determined, Judge Henley granted a preliminary injunction which, in part, prohibited the Board of Trustees and the President of the University of Arkansas from making any changes in existing AM & N policies *pendente lite. Molette v. Bumpers, supra,* No. LR–72–C–116 (E.D.Ark. July 11, 1972) (Memorandum and Order). Thus, all actions taken by the Board of Trustees with regard to UAPB were tentative, pending

approval by Judge Henley. This situation explains the references to the "judge of jurisdiction" and the "court of valid and final jurisdiction" which accompany most actions of the Board of Trustees relevant to this litigation.

The plaintiff has raised, in his pleadings and at the hearing, four identifiable claims. He initially claimed that the maintenance of separate retirement systems for the faculty of AM & N and for the faculty of the University of Arkansas prior to the merger of the two schools amounted to state–imposed racial discrimination which violated the Fourteenth Amendment to the United States Constitution and which was actionable under 42 U.S.C. § 1983. This claim has been abandoned in light of the facts that several predominantly white state colleges were also previously restricted to the same retirement system as was AM & N and that opportunities for switching systems without penalty have been available since 1967.

The second claim is that certain language in Section 4 of Act 512 creates substantive rights under state law which entitle the plaintiff to continue teaching until he reaches the age of 72 unless he is terminated for a reason other than his age. The statutory language in issue is quoted herein, as follows:

> The final plan of merger shall provide for the accomdation [sic] by the University of Arkansas of the employment contracts, tenure rights, and academic rank of the faculty and staff of Arkansas Agricultural, Mechanical and Normal College in effect during the 1970–71 academic year.

The resolution of this claim depends entirely on an interpretation of state law. This Court, however, has pendent jurisdiction over the claim and considers that it should exercise such jurisdiction in this instance. Although the Court might, under other circumstances, defer to the courts of the State of Arkansas on this issue, the need for a prompt resolution of the issue controls under the present circumstances. School has already started for this academic year, and all the parties need a resolution of the claims raised herein in order to plan for the year.

The resolution of this claim requires an initial determination of whether any of the phrases "employment contracts," "tenure rights," and "academic rank" encompasses the plaintiff's right under the former AM & N policy to teach until he reached age 72. There is no serious suggestion that "academic rank" encompasses the right claimed. There appears to be no legislative history on the meaning of the other two phrases, or, in fact, on any aspect of Act 512. Nothing has been brought to the Court's attention which would suggest that the right claimed was included in "employment contracts" or "tenure rights." Nevertheless, it might be said that the plain language of the statute requires that the right to work until a certain age be encompassed by the two phrases.

■ Assuming, without deciding, that the claimed right is a part of "employment contracts" or "tenure rights," the statute requires only that the final merger plan provide for the "accommodation" of the right. The Court interprets this to mean that the University of Arkansas, after the merger, could take any action on the rights involved which could have been taken by AM & N in the absence of the merger. Although no Arkansas law directly on point has been brought to the Court's attention, it seems to be well settled that, barring procedural irregularities, a university may lower a previously established mandatory retirement age and may apply the lower age to an already tenured professor. *See, e. g., Rehor v. Case Western Reserve University,* 43 Ohio St.2d 224, 331 N.E.2d 416 (1975), *cert. denied,* 423 U.S. 1018, 98 S.Ct. 453, 46 L.Ed.2d 390 (1975). The Court concludes that if the plaintiff was not denied due process of law in violation of the Fourteenth Amendment, as discussed below, the University of Arkansas could, after the merger, legally alter the mandatory retirement age, as AM & N could have done before the merger. Section 4 of Act 512 does not change this result.

The third claim is that the plaintiff was denied due process of law in violation of the

Fourteenth Amendment by the Board of Trustees' approving of the revised merger plan without having given notice of the revision to the merger committee which had recommended the original provision. Initially, the Court must determine whether the plaintiff possesses a property or liberty interest which invokes due process concerns. Such an interest may be created by state law. *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), indicates that the interest claimed by the plaintiff is more appropriately analyzed as a property interest than as a liberty interest. *Perry v. Sindermann*, held that a state college's de facto tenure policy may create in those teachers covered by the policy a property interest sufficient to invoke the due process requirements of the Fourteenth Amendment. The Court opined that "[a] written contract with an explicit tenure provision clearly is evidence of a formal understanding that supports a teacher's claim of entitlement to continued employment unless sufficient 'cause' is shown." *Id.* at 601, 92 S.Ct. at 2699. Such an entitlement is a property interest for Fourteenth Amendment due process purposes. *Id.*

■ The Court concludes that the plaintiff's undisputed status as a tenured professor coupled with AM & N's acknowledged policy of permitting professors to teach until age 72 created in the plaintiff an entitlement to continue employment until age 72. That is, the plaintiff had a property interest in teaching until he reached age 72, which brought into play the requirements of due process. This conclusion finds precedent in the case which, to the Court's knowledge, has most directly dealt with this issue in this context. *See Taliaferro v. Dykstra*, 434 F.Supp. 705 (E.D.Va.1977), *vacated on other grounds sub nom. Taliaferro v. Willett*, 588 F.2d 428 (4th Cir. 1978). The Court further concludes that the property interest identified was not eliminated by the merger of AM & N into the University of Arkansas. No legislative or administrative action taken prior to the Board of Trustees' final approval of the merger plan provides a basis for its elimination.

"Once it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). The Supreme Court has stressed that due process is flexible and that its procedural requirements should be tailored to the particular context in which it applies. *Id.* At a minimum, however, due process requires some kind of notice and some kind of opportunity to be heard. *Goss v. Lopez*, 419 U.S. 565, 579, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975).

■ The Court concludes that where, as here, an institution–wide policy is being changed by a quasi–legislative action, the notice and opportunity to be heard need not be as personal or as individualized as would be required if one or more individuals were being denied a property interest which still remained generally available to a class of similarly situated individuals. The Court holds that the Board of Trustees was not required to give the plaintiff personalized notice of the contemplated change in the retirement age or to give him a personal hearing in which he could be heard individually by the Trustees regarding the change.

The factual situation in *Rehor v. Case Western Reserve University, supra*, 43 Ohio St.2d at 231–32, 331 N.E.2d 416, although not analyzed in terms of due process, is informative.

So, paragraph 9 of the policy statement on retirement demonstrates the undertaking [sic] of the academic community that the retirement policy of a university can be changed, and paragraph 1D. points out that a retirement policy should be changed if needed.

This change in Case Western Reserve University's amended retirement policy was made upon the recommendation of its faculty, after study and open hearings; the amended retirement policy had a grandfather provision. When its retirement policy was amended, it also amended (232) its pension plan to provide increased university contributions to Professor Rehor's retirement plan account. Professor Rehor's retirement age of 68,

under the amended retirement policy, was well within the American Association of University Professors' suggested range of retirement ages from 65 to 70. Rehor's salary was increased annually in each year of his employment under Case Western Reserve University from September 1969 to June 1973. A representative of the association was an ex officio member of the committee that recommended the amended retirement policy. All the above facts indicate the reasonableness of the policy.

The court in *Taliaferro v. Dykstra, supra,* 434 F.Supp. at 711, found a denial of due process where, in contrast, there was no understanding that the policy might be changed and there was no opportunity for faculty input into the change.

Although no more specific guidelines have been discovered, it seems appropriate to require a state university's governing board, before lowering an established mandatory retirement age, to give at least general notice that a change in policy is contemplated and to provide a mechanism for faculty input into the change. Such procedures enable the affected faculty members to bring any relevant concerns to the attention of the decision–makers.

These requirements were met in this case. A state statute was passed providing for the merger. Faculty members from the University of Arkansas and from AM & N were appointed to the merger committee. The committee developed and discussed at length a comprehensive merger plan. At least one faculty meeting was held at AM & N at which all aspects of the merger were open to discussion. The plaintiff knew of the potential policy changes to be involved in the merger from the letter which gave notice of the aforementioned faculty meeting and which included a copy of the merger committee's recommended plan. The Court holds that the requirements of pre–change notice and an opportunity for input were satisfied in this case.

█ The plaintiff claims, however, that Section 4 of Act 512 created an interest which entitled the merger committee to

have a larger role in the formulation of the final merger plan adopted by the Board of Trustees than that of merely making an initial recommendation. It is not clear whether the plaintiff is asserting that the merger committee had the ultimate authority for adoption of the plan or only that the committee should have been given a chance to review and comment on the final plan, as revised, before it was adopted. In either case, the Court finds no merit in the plaintiff's argument. The Court interprets Section 4 as giving the merger committee only an advisory responsibility and a recommending function. The ultimate authority remained with the Boards of Trustees of the two schools affected. After July 1, 1972, pursuant to Section 5 of Act 512, the Board of Trustees of the University of Arkansas had the ultimate authority for the operation of both schools. Act 512 did not delegate to the merger committee powers otherwise reserved for the Board of Trustees. This analysis eliminates any claim that Act 512 created, as a matter of state law, any right in the merger committee or in the plaintiff to have more input into the final plan than was actually had.

The fourth claim is that, even if the change in the mandatory retirement age was properly adopted by the Board of Trustees, as the Court has held, the plaintiff was denied due process of law in that he was not given notice of the change *after* its adoption. He asserts that the lack of notice of the change precluded him from making informed choices concerning his retirement plans and from taking full advantage of the options which were available to him.

Although the predicate for the claimed right of postadoption notice is not clear, it does seem reasonable to conclude that if the Board adopted the change in secret and concealed it until the plaintiff was terminated, the plaintiff would have been denied due process. If, however, the Board acted openly, as it did in this case, it is not clear whether the plaintiff was entitled to any further notice of the change.

█ The Court need not decide whether due process requires the claimed post–

adoption notice because, even assuming that the notice was required, the Court concludes that the Board fully discharged its duty in this regard and did all that might have been required of it to give notice to the plaintiff. The Court has found that the Board of Trustees did what was reasonably expected as necessary to give notice to those affected by the finally adopted merger plan. Dr. Leon Torrence, Vice Chancellor for Student Affairs at UAPB, testified that, at some unknown date, Dr. Charles Oxford of the University of Arkansas sent him a copy of the finally adopted plan. According to Dr. Vannette Johnson, also of UAPB, Dr. Torrence sent the plan to him, and he promptly sent the plan to Dr. Eugene Dalton, President of the Faculty Senate at UAPB. None of these people disseminated the plan or made arrangements for its dissemination. The plaintiff stated that he did read pages 41 and 41A of the UAPB Faculty/Staff Handbook for 1976–77, so he did have actual knowledge of the contents of those pages.

Dr. Charles Oxford, who has held various administrative positions at the University of Arkansas, testified that Chancellor Herman Smith of UAPB was present at both the meeting of the Legal Committee at which the proposed plan was referred to President Bishop for revision and the meeting of the Board of Trustees at which the final plan was adopted. Joint Exhibits 11 and 13 confirm that Chancellor Smith was present at both meetings. Dr. Oxford further testified that his office sent copies of the final plan to the Chancellors, among others, within seven to ten days after the Board meeting at which it was approved. He also testified that it was routine practice to send copies of the minutes of Board meetings to Chancellors, Vice Chancellors, and others within about a week after each meeting. Joint Exhibits 5 and 7 indicate that copies of the final plan were also mailed to Vice Chancellor Rufus Barfield of UAPB on November 30, 1977.

■ From the evidence, the Court finds that Chancellor Smith had notice of the contents of the finally adopted merger plan both before[1] and after its adoption. He did not in turn, however, give actual notice of the contents of the final plan to all members of the faculty at UAPB. The Court cannot grant the plaintiff the injunctive relief sought as against Chancellor Smith, even though he is a named defendant, because he is not in a position to effectuate the relief prayed for. The question therefore becomes whether the defendant Board members should be required to continue to employ the plaintiff on the basis of Chancellor Smith's failure to give specific, actual notice to the UAPB faculty, including the plaintiff.

■ The Court concludes that the defendant Board members should not be required to continue to employ the plaintiff on this basis. As indicated by Dr. Oxford, the Board followed its regular and accepted method for communicating with the UAPB faculty by giving information to Chancellor Smith which was intended for the faculty. Chancellor Smith is the conduit for communication between the Board and the UAPB faculty. As such, he is a representative of the UAPB faculty as well as a means of communication for the Board. In fact, he is more closely associated with the UAPB faculty than he is with the Board. His presence at Board meetings is intended to provide a channel for communicating UAPB

---

1. Both President Bishop and Chancellor Smith had received copies of the committee's original recommendations. It is clear from the evidence that President Bishop and Chancellor Smith contemplated changes of some kind in the retirement provision of the committee's draft. Dr. Oxford had also made known to President Bishop his own dissatisfaction with any provision that would extend an exemption beyond July 1, 1980. When the matter was presented to the legal committee in the presence of the Board members and Chancellor Smith, it was referred back to President Bishop for revision and with the further instruction, by way of resolution, that after the revisions had been made the matter would be resubmitted directly to the Board of Trustees. That is, there was no provision for the matter to be referred back to the joint committee. The new language was drafted by President Bishop's office, apparently in consultation with Chancellor Smith. In any event, the new plan was distributed to all members of the Board and to Chancellor Smith and others *before* the Board's meeting.

faculty ideas to the Board and for communicating Board actions to the faculty. The Court concludes that the defendant Board members did all that due process might have required of them, in terms of giving notice of the change to the plaintiff, by adopting the change in policy in an open meeting, giving Chancellor Smith notice of the contents and adoption of the final merger plan, and sending copies of the minutes of Board meetings and copies of the finally adopted merger plan to Chancellor Smith, among others. The Court therefore holds that the plaintiff was not denied due process of law, as he has claimed, by virtue of his not receiving actual notice of the change in policy until late in 1979.

Having rejected the plaintiff's claims for relief, the Court will dismiss the complaint and deny the relief sought. The motion for a preliminary injunction is mooted by that action.

It is therefore Ordered that the complaint be, and it is hereby, dismissed and that the relief prayed for be, and it is hereby, denied.